JAMES RHODES et al. v. THOMAS CRUTCHFIELD et al..

1. **EJECTMENT.** *Infant heirs.* *Judgment.* *When not conclusive.* Judgment in ejectment or ejectment bill is not conclusive on infant heirs, and they may re-litigate questions of title under a cross-bill for mesne profits.

2. **SAME.** *Action for mesne profits.* *Survives.* *Administrator.* An action *ex-contractu* for mesne profits survives to the personal representative of plaintiff in ejectment.

3. **SAME.** *Mesne profits.* *Limitations.* The statute of limitations does not begin to run against an action of trespass for mesne profits until recovery in ejectment; but where the suit is in contract, waiving the tort, the plaintiff can only recover rents for six years next before suit is brought.

4. **SAME.** *Judgments.* *When void.* A judgment in ejectment in favor of several plaintiffs, some of whom are then dead, is void as to plaintiffs and heirs of plaintiffs then dead, but good as to living plaintiffs.

FROM MEIGS.

Appeal from the Chancery Court at Decatur. W. M. BRADFORD, Ch.

A. BLIZZARD, WM. M. BAXTER and CALDWELL &. SON for complainants.

VAN DYKE, COOKE & VAN DYKE, J. H. GAUT, PERRY GAUT, GAUT & GAUT and KEY & RICHMOND. for defendants.

MCFARLAND, J., delivered the opinion of the court.

This is a continuation of a celebrated controversy, which in some form or other has been in progress.

for more than forty years, over the title to an island in the Tennessee river, now in Meigs county, known as Jolly's island.

After other litigation not necessary now to mention, in June, 1856, an action of ejectment was begun in Meigs county to recover the island by a large number of persons claiming to be the heirs of Thos. Hopkins, a citizen of Warren county, who died in March, 1836, as it is claimed, seized and possessed of the island. The action was against a number of persons, who were merely tenants, but soon after its institution Thos. H. Calloway, claiming, to be landlord of the persons sued, and owner of the land, was permitted to defend in their stead. The cause, from various reasons, was delayed for many years. In August, 1870, Thos. H. Calloway died, and the cause was afterwards revived against his heirs, and finally tried, and a judgment rendered against them, which was affirmed by this court at the September term, 1873, but the final judgment was not entered until the September term, 1874. Thomas Hopkins died unmarried, and his heirs were eight brothers and sisters, or their descendants, and were very numerous. All of them were not plaintiffs in the action of ejectment, and during the progress of the cause the deaths of many of the plaintiffs were suggested, and from time to time revivors were entered, but it seems that in some instances there were no revivors. The final judgment of this court shows the names of the plaintiffs who recovered. The interest of each is not in every instance set forth separately, but in some in-

stances a number of persons, representing one of the brothers or sisters of Thomas Hopkins, are allowed to recover jointly a fractional part, either one-eighth or fraction of one eighth. So it is, the entire shares recovered amounted to something more than eighty one-hundredths ($\frac{80}{100}$) of the whole. This judgment was executed by a writ of possession. Soon after the termination of said action, to wit, 19th January, 1875, the present bill was filed, the object of which is to recover rents and profits during the pendency of said action of ejectment and damages for the destruction of timber.

Some question is made as to whether all the complainants in the present bill are entitled to benefits of said recovery in ejectment and the rights supposed to be consequent thereon as to rents and profits, to which we will recur hereafter.

This bill is filed against the heirs of Thomas H. Calloway as well as his personal representative, and also against William and Thos. Crutchfield and Lowry Williams and wife, the heirs of Thos. Crutchfield, deceased, and a recovery of rents and profits and damages is claimed against them as well as against the Calloways, it being charged that the persons originally sued in the action of ejectment were the tenants of the Crutchfields as well as the Calloways, although, as we have seen, Calloway only came forward and had himself made a defendant to said action.

It appears that at the date of the demise laid in the declaration in ejectment, to-wit, 1st of January, 1850, or about that time, Thomas H. Calloway was

Rhodes v. Crutchfield.

setting up title to the island by virtue of grants to hims-lf from the State, and there was an agreement between himself and Thomas Crutchfield that the title was to be held for their joint benefit, one-fourth to Calloway and three-fourths to Crutchfield, and such claim as Crutchfield afterwards set up was under this agreement. Said Thomas Crutchfield, however, died in March, 1850, and whatever right he had under said contract devolved upon his heirs. His son, Thos. Crutchfield, is also made a party, as administrator or executor of his father's estate. It is upon these allegations, and the further allegation that they have by themselves or tenants received the rents and profits, that they are made defendants, and relief prayed against them.

The Calloway heirs, soon after their appearance, filed an original bill in the nature of a cross-bill, in which they seek, among other things, to re-try the question of title and to recover back the land from the Hopkins heirs. The Crutchfields also file their original bill in the nature of a cross-bill for the same purpose. The general features of these two bills are the same, and we have discovered no material difference in their statements of facts. These bills were answered and proof taken, and, on final hearing, they were dismissed by the chancellor, and a decree rendered in favor of the complainants in the original bill, declaring their right to recover rents and profits, settling principles in regard thereto, and ordering an account. From this decree the Calloways and Crutchfields, by leave of the chancellor, have appealed.

The first question is, whether the Calloways or the Crutchfields, or any or all of them have the right to re-litigate the question of title, or are they precluded by the judgment in the action of ejectment? To maintain their right to re-open the question of title, various grounds have been assumed in argument, based upon the statements of their bills. Many of these grounds go alone to mere irregularities in the progress of the action of ejectment, and need not be particularly noticed. It is argued that the failure to demur to the bills of Calloway and Crutchfield re-opens all questions of title for trial *de novo*, and further, it is alleged that on the trial of the action of ejectment the circuit judge delivered one charge to the jury, and wrote out and embodied in the bill of exceptions upon which the cause was brought to this court, a materially different charge, greatly to the prejudice of the defendants in said cause, and refused to make the proper correction when applied to for the purpose, and that upon this ground the judgment in ejectment should not be held conclusive as to the title. For the present we pass these questions, for the reason that, upon a different ground, the title must be tried *de novo* as to at least part of the defendants in the action of ejectment.

It appears that at the time of the final recovery in ejectment, eight out of the ten heirs of Thomas H. Calloway against whom the recovery was had were infants under twenty-one years of age, and their bill in this case was filed in a few months thereafter, the majority of them being still infants. It was the well-

settled rule of the common law that a judgment in
ejectment was not conclusive upon either party as to
the title, but successive actions might be brought and
the title re-litigated until a court of chancery should
interfere and enjoin further contest.   This rule was
changed or modified with us by the act of 1851–2,
ch. 152, to the extent shown by secs. 3252–3 of the
Code, taken from said act, and which are as follows:
"Any such judgment," referring to judgments in eject-
ment, "is conclusive upon the party against whom it
is recovered, *not under disability at the time of the re-
covery,* and all persons claiming under him by title
accruing after the commencement of the action."   Sec.
3253 : " If the person against whom the recovery is
had is under the disability of infancy, coverture, or
unsoundness of mind at the *time of the recovery,* the
judgment is no bar to an action commenced within
three years after the removal of such disability."   We
see no answer to the position, that at least the infant
heirs of Thos. H. Calloway have the right, by the
very letter of the above statute, to re-try the title
under their bill filed for that purpose.   We are un-
able to see that it makes any difference that the ac-
tion was begun against Thos. H. Calloway and revived
against his heirs ;   they are still within the very letter
of the statute.   For the present we need not deter-
mine the attitude of the Crutchfields further than to
say, that if they were bound by the judgment in the
action of ejectment because privies in estate with the
Calloways, or because, in the language of the statute,
they claim under the Calloways by title subsequently

acquired, then Mrs. Williams, being a *feme covert* when the recovery was had, was likewise within the exception, and may set up title if she has any.

Assuming, therefore, that, as to the infant heirs of Thos. H. Calloway, the question of title remains unadjudicated, we must proceed to consider the questions upon which the title depends as shown by the record. At the outset of the contest, the title of Thos. Hopkins was sought to be established by showing that the island had been granted by the State of North Carolina to Hacket and Donelson in 1794, and while the claim of title by which it was claimed. that Thomas Hopkins was connected with said grant was not perfect, it was nevertheless maintained that at all events Thomas Hopkins had held the island by his tenants under color of title for more than seven years after the issuance of said grant. This court, however, when the action of ejectment was before it at a term preceding the final hearing, to-wit, the September term, 1872, held said grant void, upon the ground that it was issued by the State of North Carolina after that State, by the cession act, parted with all title to the territory covered by the grant, reserving only the right to perfect incipient titles acquired by entry before the cession act, and that the grant in question was not shown to have been founded upon such previous entry, and the grant was furthermore not validated by the act of 1819 of this State, to which reference will hereafter be made. The decision is reported in 11 Heis., 349. The cause was then remanded for another trial. Upon the last trial the plaintiffs made

out the title of Thomas Hopkins' heirs by showing to the satisfaction of the jury, under the charge of the court, twenty years' possession by Thomas Hopkins and his heirs by their tenants, beginning about the year 1820 or 1821. The question before this court on the final hearing of said cause was, whether the fact of possession, if established, would, under the law, raise a legal presumption of a grant. The argument in behalf of the Calloway heirs, in brief, was, that the land was at no time subject to entry and grant under the laws of North Carolina, and was at no time subject to entry and grant under the laws of Tennessee until the year 1844, and the possession of the Hopkins heirs terminated either before or shortly after that date, or, at all events, they had not possession sufficient to raise a presumption of the issuance of a grant after that date; but that, on the other hand, soon after the land became subject to entry, Thos. H. Calloway entered and obtained a valid grant in 1850; therefore, it was argued that no presumption of a grant could arise from the possession of Thomas Hopkins and his heirs for twenty years from and after 1820 or 1821, for the reason that if such grant had actually issued it would have been void,— and the law will not presume an illegal act, as the issuance of a void grant.

It seems that the first laws under which entries of lands were made in the territory of Tennessee was upon the establishment of Washington county in 1777, embracing the whole territory of the State and providing for the opening of land offices; but previous

to this a treaty had been made with the Indians, reserving to them all the lands west of a line called Brown's line, which passed across the upper portion of East Tennessee by Chimneytop mountain and crossing the Holston at the mouth of Cloud's creek. By an act of the Legislature of North Carolina, passed in 1778, ch. 3, all persons are prohibited from entering lands within the Indian hunting grounds, and the line referred to is recognized, and all entries and surveys of land which had been previously made or which might thereafter be made within said Indian boundaries were declared null and void, and the entrytakers of the counties of Burke and Washington were strictly commanded to immediately refund to the proper persons all moneys received for such entries, including their fees. It has, we believe, been generally held that entries of land to which the Indian title had not been extinguished, and grants founded thereon, were void absolutely: *Gillespie* v. *Cunningham,* 2 Hum., 19; *McLemore* v. *Wright,* 2 Yer., 326; 1 Tenn., 169. It seems to be beyond controversy that the Indian title to Jolly's island was not extinguished until 1819, when it was acquired by a treaty in which the island was specially named, and further, it was not open to entry until 1844. The acts throwing open, first, the Hiawassee district, and afterwards the Oconee district, to entry, were held not to include the island, but its entry was authorized by an act passed in 1844; hence, it was argued, that, as this was the first time the island could have been lawfully entered, the possession of the Hopkins heirs from 1821 to 1841 could afford

no legal presumption of a grant.    To meet this, the act of the Legislature of this State of 1819, ch. 50, was relied upon.    It is entitled "An act to make good all grants issued by the State of North Carolina on entries and warrants made west of Brown's line." The preamble is as follows:    "Whereas, in the year 1779 (1778) the State of North Carolina passed a law forbidding the entering of land west of a line called Brown's line, which act declares all entries heretofore made and grants heretofore issued, and all entries hereafter made and grants hereafter issued, for any land west of the before described line, null and void, and required the enterers to call on the entrytaker and receive their money for said entry, yet said entrytaker never did refund said money, and said entries and warrants were perfected into grants:    therefore,

"1. Be it enacted by the General Assembly of the State of Tennessee, That all grants heretofore issued and all grants hereafter issued on said entries and warrants, when the money was actually paid, shall be good and valid to all intents and purposes, both in law and equity."

This act was relied upon to render valid the original grant of 1794 to Hacket and Donelson before referred to, but we held that the act was only intended to apply to those grants which would have been valid but for the fact that the land lay west of Brown's line; that it was not intended to validate the Hacket and Donelson grant, for the reason that said grant was issued by the State of North Carolina after it had parted with all right to issue grants for

lands in Tennessee, except to perfect previous entries, and this grant was not founded upon such previous entry. Upon the last hearing before this court, this act was made use of as a reply to the argument that the land was not subject to entry under the laws of North Carolina, and therefore no grant could be presumed from possession. Judge Nicholson disposed of the question as follows: "It is further insisted that the charge is erroneous because the presumption of a grant was not a legal possibility, for the reason that there was no law, either of North Carolina or Tennessee, which subjected Jolly island to entry until the act of 1844, under which defendants entered and obtained grants. Without enquiring whether, at any time after the cession act of 1789, any lawful entry of the island could have been made before 1844, it is clear that a grant upon an entry previous to the cession act to Jolly's island would only have been liable to the objection that it lay west of Brown's line, and therefore void under the act of 1778 of North Carolina. But that objection was removed by the act of 1819 as to all grants founded on entries made previous to the cession act for lands west of Brown's line. The only ground on which the Hacket and Donelson grant of 1794 was held not to be validated by the act of 1819, was that it appeared on its face to be founded on money paid, and not an entry. It follows that if the grant had been founded on an entry, it would have been made valid under the act of 1819. It seems clear, therefore, that the issuance of such a grant prior to the act of cession was not

a legal impossibility, and hence the presumption of such a grant was legitimate."

The question now is, shall we adhere to this decision? I had grave doubts of the correctness of this decision at the time it was rendered, but did not announce my dissent. I still have strong doubts of its correctness. It is clear enough that the act was intended to make valid all grants for lands west of Brown's line, either issued before the cession act or founded upon entries previous thereto, *when the money was actually paid,* and, upon the actual production of such grants in such cases, the act removed their illegality and rendered them valid. But the question is, will the law presume such illegal grants to be thus rendered valid? Were this an open question, I am not prepared to say that I . would adopt the view taken in the opinion quoted. Nevertheless, it was the deliberate judgment of the court upon full consideration, and was adhered to upon a petition to rehear. While it is not an adjudication in the present case, it is direct authority, and the contrary view is not so clear as to authorize us to overrule the decision, and .it must therefore be adhered to.

The question then arises whether the fact of twenty years' possession is established by the proof. The testimony is the same upon which the action of ejectment was tried. The possession is shown to have commenced about the year 1821. There is some conflict as to the possession from about the year 1838, and for a few years thereafter. About 1838 Crutchfield obtained a grant, and endeavored to obtain pos-

34—vol. 7.

session of the island.   He brought an action of eject-
ment against two tenants in possession, but failed, his
grant being declared void: see *Crutchfield's Lessee* v.
*Hammond*, 4 Hum.   After this the weight of proof
indicates that the tenants in possession recognized the
title of the Hopkins heirs until about 1850, when
Calloway, having obtained his grant, succeeded in ac-
quiring possession, and soon after the litigation began.

The possession from 1821 to 1843 being shown to
have been with Hopkins and his heirs, and also from
1843 for several years thereafter, the onus would be
upon the Calloway heirs to show the break or change
in the character of possession alleged to have occurred
about the year 1838 and for a few years thereafter.
This, we think, they have failed to do.   The result
is, that complainants in the cross-bill have failed to
show a right to recover the property back from the
Hopkins heirs, and their bills, so far as they seek
this relief, must be dismissed.

Next—as we have seen, in the progress of the ac-
tion of ejectment a number of the original plaintiffs
died, and as to some of them the cause was revived
in the names of their heirs, and final judgment ren-
dered in their favor; and, as we have also seen,
Thos. H. Calloway, the defendant, died pending the
action, which was revived, and the recovery had against
his heirs—it is argued for the defendant that this being
in effect an action for mesne profits, which was at the
common law an action of tort, it died with the per-
son, and that no recovery of rents can be had in
favor of the administrator of such of the plaintiffs as

Rhodes *v.* Crutchfield.

·died pending the action, for rents which accrued up to the time of the death; nor can any recovery be had against the personal representative of Thomas H. Calloway for the rents for which he was liable at the time of his death. The theory of the bill is, that when a plaintiff died pending the action, the right to recover his share of the rents that accrued up to that time devolves upon his personal representative; that the heir (of such deceased plaintiff) in whose name the suit was revived and prosecuted to judgment, has the right to recover his share of the rents that accrued from the time the title descended to him, and the personal representative of the deceased defendant is liable for rents up to his death, and his heirs against whom the action was revived are liable for rents after that date.

*First,* does the right of action to recover rents survive to the administrator of the plaintiffs who died pending the action of ejectment, where the cause was revived and prosecuted to judgment by their heirs?

It is said in Wait's Actions and Defenses, that the death of the plaintiff *after judgment* has merely the effect to transfer the right of recovery for mesne profits to his *heirs* (vol. 3, p. 129). We have not access to the authority cited by the author.

This court has held that an action for trespass on lands prosecuted to judgment for the plaintiff, does not abate by reason of the death of the plaintiff pending an appeal in error: *Hunter* v. *McGhee,* 3 Sneed, 128. But an administrator cannot maintain such action for trespass upon the lands of his intestate when the lat-

ter had not commenced the action in his lifetime: *Baker* v. *Dansbee*, 7 Heis., 229. The law allows the action to be revived by the administrator, but he cannot maintain such action instituted by himself. The above were actions of trespass, but not for mesne profits.

In *Brown & Smith* v. *McCloud*, 3 Head, 281, it was held. that the action of trespass for mesne profits belongs to the person having the title, and hence such right of action for trespass, occurring after the death of a testator, belongs to the heir and not to the executor, the lands not having been specifically devised.

In *Avent* v. *Hord*, 3 Head, 459, it was held that the action only accrues after a recovery in ejectment. If the action does not accrue until a recovery in ejectment, the result is that, as to the plaintiffs who died pending that action, no action for mesne profits accrued to them in their lifetime; it only accrued after their death; and when the right accrued, it must either accrue to the administrator or heir or be lost altogether. The original plaintiff, and her heir in whose name the action is revived, might be treated as identical, and the action for mesne profits allowed in the name of the latter for the entire period, but this would be to allow the heir to recover for trespass and rents of land due to his ancestor. To deny the right of recovery to the administrator is to deny the right altogether, if we adhere to the doctrine that no action for mesne profits can be maintained until a recovery in ejectment. As we have seen, the ordinary action for trespass on land does not survive in

Rhodes *v.* Crutchfield.

favor of the personal representative of the plaintiff, nor does it survive against the representative of the defendant: Wait's Actions and Defenses, vol. 3, p. 129. This is upon the theory that it is action of tort and not contract.

The question is, whether there is any distinction in this respect between an action of trespass and action of trespass for mesne profits.

In the case of *The Governor* v. *McManus*, 11 Hum., 152, it is said the rule of the common law is, that action survives when the cause of action is money due on a contract express *or implied*, or *gain by the work or property* of another; but where the cause of action is a tort, then the action dies, as in the case of a battery, false imprisonment, trespass, words, nuisance, and cases of the like kind.

It has been held with us that torts for the conversion of property may be waived and action maintained upon the promise implied by law to pay its value: *Kirkman* v. *Philips*, 7 Heis., 222; *Alsbrook* v. *Hathaway*, 3 Sneed, 454; *Campbell* v. *Reeves*, 3 Head, 228; *ibid.*, 675. This rule might be applied where the rents and profits of land have been taken and appropriated, and, upon this theory, the action held to survive both in favor of the administrator of the plaintiff and against the administrator of the defendant.

With us, forms of action have been abolished, and this bill may be taken as asking for relief upon the facts of the case—waiving the tort and suing for the value of the rents received and converted.

But on this aspect of the case another question arises, and that is as to the statute of limitations. In *Avent* v. *Hord* it was held that the time pending the action of ejectment could not be relied on as a bar under the statute of limitations, but that the recovery may be had from the demise laid in the declaration. This was upon the theory that the action for mesne profits does not accrue until a recovery in ejectment, and until the right accrued no statute could run against it.

In that case it was said that the tort could not be waived and action brought for use and occupation of the land, or if it could be done at all, it could only be as to profits accruing antecedently to the demise in ejectment, because such action is inconsistent with the action of ejectment. For the period after the demise no action could be maintained for use and occupation waiving the tort. But, as above indicated, the theory upon which the action for rents may be held to survive, is that the tort may be waived and the action maintained for use and occupation or the value of the rents converted. If so, this action could be maintained without waiting for a recovery in ejectment, and would consequently be barred by the statute of limitations. I am, therefore, inclined to the opinion that a right of action for the value of rents survives, but the recovery must be limited to the period of six years next before the action was brought.

It is true the technical action of trespass for mesne profits does not accrue until a recovery in ejectment; but it is equally true that, technically, the action dies

with the person.   I think, as already indicated, that this result may be, and ought to be avoided in a case of this character, by allowing the tort to be waived and an action brought for use and occupation; but if so, this could as well be done before as after a recovery in ejectment, and the logical result is, that the statute of limitations would apply.   Judge Caruthers, in *Avent* v. *Hord,* concedes that most of the elementary books, as well as some reported cases, lay it down that the plea of the statute limits the recovery to the term prescribed for the bar; and so it is stated in Wait's Actions and Defenses, vol. 3, p. 131. But Judge Caruthers says these authorities are traceable to a sentence in Butler's N. P., which is without sufficient authority to sustain it.   Judge Caruthers' conclusion follows logically from his premises; but we have to depart from his premises so far as to hold that the tort may be waived and an action for use and occupation maintained, and this logically changes the result as to the statute of limitations.

Another question is this:   It appears that at the time the final judgment in ejectment was rendered, a number of the plaintiffs in whose names the recovery was had were in reality dead, and in fact had been for several years.   We agree that the judgment as to them was void: *Hewgly* v. *Johns*, 3 Baxt., 85; *Wheatley* v. *Harvey*, 1 Swan, 484.   And we are furthermore of opinion that the survivors are not entitled to the benefit of the entire recovery.   If the recovery had been in the name of the survivors, then it would be valid to the full extent, for it might well be that

the survivors were the heirs of the deceased plaintiffs and recovered their share . of the land : *Gilchrist* v. *Cannon,* 1 Cold. But this cannot be so where the recovery is in the name of the dead plaintiff. We cannot give the benefit of that recovery to another, and the judgment of the dead plaintiff must be held void. But we think the judgments valid as to living plaintiffs. It is true there may be some uncertainty as to the portion of the recovery to which they are entitled, the judgment itself not showing it, but we think it may be ascertained by looking to the proof to see their share as heir. We must either do this or allow the recovery to fail for uncertainty, and justice ought not for this reason to fail.

Upon the theory of this bill which we have maintained, the owners of the land may maintain this cause for the recovery of rents independent of the recovery in ejectment, *if they could show title,* but, from the lapse of time and other causes, their title cannot be affirmed independent of the judgment in ejectment. All relief, therefore, will be denied to the administrator of those parties who were dead when the judgment in ejectment was rendered, and as to whose interests the cause was not revived, and their share of the rents deducted; and furthermore, the recovery in ejectment will be declared void as to the plaintiffs who were at the time dead. To this extent the cross-bills may be maintained.

Against whom shall the recovery of rents be had? The judgment in the ejectment suit was against the Calloway heirs, but it appears that from and after

1867 Thomas Crutchfield collected the rents from the tenants. He did this under the authority of Calloway. The Crutchfields were, by the agreement of their ancestor, entitled in equity to three-fourths of Calloway's title, but whether on this account or on account of other unsettled matters between them, the rents were to be applied, the evidence is uncertain. Thomas Crutchfield says he received the rents to be held for settlement against other claims due his father's estate from Calloway, but it does not appear whether he paid any portion of the money received to the other Crutchfield heirs. The heirs of Calloway did not receive any rents. By the terms of renting, Crutchfield says the rents, after the death of Calloway, were payable to Calloway's executor. We see no ground upon which we can charge Wm. Crutchfield or Lowery Williams and wife with rents, but we are of opinion that the personal representative and heirs of Thomas H. Calloway and Thomas Crutchfield must account. The right to a partition if practical, or a sale for the purpose, follows as a matter of course in behalf of such of the plaintiffs who recovered in ejectment as were not then dead.

A decree will be drawn in accordance with this opinion, and the cause remanded to take the account. The costs of this court will be divided.